# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*Leave to file granted*

*RJL*

*6/15/20*

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff** | ) <br> ) <br> ) |
| | ) **Case No. CR-03-356-02 (RJL)** |
| **V** | ) <br> ) **Presiding Judge:** *Richard J. Leon* |
| | ) |
| **AARON WILLIAMS**<br>**Defendant** | ) <br> ) |

### DEFENDANTS MOTION UNDER 18 U.S.C. § 3582(c)(1)(A)(i)
### TO MODIFY HIS SENTENCE

COMES NOW, Aaron Williams, Pro se the defendant in the above noted case and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement until September 20, 2025 his home confinement release date, to be followed by the already-imposed term of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing and poses extraordinary risks to the defendant's health.

Attorney General Barr has recognized that the Bureau of Prisons (BOP) and its facilities are "most affected by COVID-19," and that the virus is "an emergency condition" that is "materially affecting operations in that facility". (Attorney General William Barr, Memorandum for Director of Prisons Re: Increasing Use of Home Confinement at Institutions affected by COVID-19, Apr. 3, 2020). The virus thrives in densely packed populations. The BOP has proven that it is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for inmates.

**BUREAU OF PRISONS**

The Bureau of Prisons initially posted guidelines for families and prisoners, only to retract them days later. Some prisoners and their families have said people have been placed in quarantines for release, only to be sent back to the general prison population a few days later. Some federal judges have even resorted to ordering prison officials to define their policy in writing.

The Bureau of Prisons is doing a terrible job carrying out the policies set in Barr's memo and the CARES Act stimulus bill, which expanded eligibility for release, said David Patton, the chief federal public defender in the New York City area. "They don't want to let people out," Patton said. "It's not in their DNA."

The data show that in the last three weeks 89 other prisoners nationwide received "compassionate release,"

The confusion over how the Bureau of Prison is applying the guidance prompted a bipartisan request this week from Sen. Chuck Grassley, an Iowa Republican, and Sen. Dick Durbin, an Illinois Democrat. They asked the Department of Justice's Inspector General to investigate whether the bureau is quickly transferring all vulnerable inmates to home confinement, and whether the department has been transparent and accurate when communicating with Congress and the public.

Barr's memo raised hopes among prisoners and their families of broader releases. After he announced it, the Bureau of Prisons posted a list of questions and answers about early release, saying inmates who served half their sentence would be considered for home confinement—after a 14-day quarantine in prison. That memo has since been removed from the agency's website.

Prosecutors opposed the release, saying Scparta was not currently ill and had more than 30 days left on his sentence.

"The BOP has implemented extensive national measures to mitigate the spread of COVID-19 within prisons," their filing said.

Four inmates died at Butner of COVID-19 over the following three days.

## DISTRICT COURTS INTERVENTION

In a case of a defendant seeking the assistance of his sentencing Court the BOP through the U.S. Attorney's Office ran afoul of the Court. After U.S. District Court Judge Alison Nathan sought details, the Bureau of Prisons said Scparta (Defendant/Inmate) had been approved for release and placed in a dorm for quarantine. But after four days, a prisoner in the dorm tested positive for COVID-19, so the bureau set Scparta's quarantine clock back to zero. He and all other inmates in that dorm would have to serve another 14 days, court records show.

Nathan wrote this policy was "Kafkaesque" and a "bizarre limbo," with inmates quarantined in close quarters while the virus runs rampant through the prison, and the 14-day clock resetting as the inevitable positive case appears.

"The senselessness of this policy is laid bare by two undisputed scientific facts: (1) individuals who are asymptomatic are capable of spreading COVID-19, and (2) individuals infected with COVID-19 may not show any symptoms for days," the judge wrote.

Nathan granted compassionate release on April 20, and ordered Scparta to quarantine 14 days at his home in New York.

## PROCEDURAL HISTORY

The defendant was arrested and charged in a Superior Court case for second degree murder in which he was sentenced to 240 months of incarceration in the BOP. The defendant has served 14 of the 20 year sentence and when good time credits are added along with his eligibility of home confinement and halfway house time up to 18 months he could be released by September 2021, about 15 months from this filing.

The defendant was originally held on a gun charge while his current cases investigation was taking place. The defendant was held because he could not be charged on the pending investigation. This false imprisonment was never brought to the Courts attention and the defendant suffered two additional years of incarceration he did not have to face. If this was considered today he would currently have over served his sentence by close to a year.

Due to the BOP not adhering to the conditions of halfway house and credit for

## CURRENT **EMERGENCY** CONDITIONS OF CONFINEMENT

FCI Fort Dix, the prison that the defendant is currently housed at is in a dire state of emergency that has placed the defendant in grave danger. The prison consists of old buildings formerly operated by the Armed Forces and now having some shuttered due to the danger they pose. The building has no air conditioning or ventilation therefore causing the need for the use of fans in order to sleep and live. Various other prisons have informed inmates that they are not allowed to use fans as this can cause the spread of the Coronavirus thus causing the inmates to suffer the heat all while being confined 24/7 to their dorms and not allowed outside.

The prison is not providing any cleaning products for the inmates to sanitize their living quarters causing the inmates to use watered down chemicals with no labels or instructions on them to clean their rooms.

The prison has not taken any pre-care precautions on the spread of the virus, nor have they provided any material that will teach the inmates how to prevent the spread of this.

The officers rotate between units and the general public carrying germs from one to the other with no regard for wearing any face covering unless during the day shift when supervisors are present. The inmates live in cubes with as many as 20 inmates per cube sleeping 18 inches apart, eliminating any chance of social distancing. The danger of the living conditions is evident and its only a matter of time before one person infects all of the inmates and what the courts handed down as 10 and 15-year rehabilitation sentences turn into death penalties.

In a federal lawsuit filed by the ACLU they claim the prisons are shorting the numbers of the inmates who have contracted the virus. Specifically FCI Fort Dix where the prison claims 40 people have become ill from COVID-19 the ACLU said "the number is exponentially higher".

In one instance an inmate who collapsed was helped by fellow inmates until a nurse and security guard arrived. The guard began spraying the inmate with a mist from head to toe and when the other inmates began yelling to help him, one asking the guard what he was doing he simply said he was disinfecting him.

By their nature, prisons are infectious disease vectors, as individuals are held in close quarters, without any ability to practice social distancing or other preventative measures. As of May 4, 2020, the BOP reported 2,100, inmates were infected with the virus and 365 staff members of which 42 inmates passed away. This is a 62% increase in the last 8 days. These numbers when verified are severely false.

The BOP reports there are no infected inmates at FCI Englewood in Colorado. Last count from inmates and staff there were well over 40 inmates affected. The BOP reported zero inmates infected at the female prison in Tallahassee yet at last count there were at least 4 known cases. This is just two of the 122 institutions and 12 private facilities. FCI Sandstone in Minnesota has at least 17 cases yet they are not even listed as a prison in the BOP system. The BOP is providing false recordings, and this is not only causing panic amongst inmates but more so placing them in danger, a danger that is being covered up by the BOP.

This causes an emergency situation that the Court should take the reins of. The defendant who suffers from blood clots and shortness of breath is placed amongst the one most likely to catch the Coronavirus and suffer immediate harm if not death. In a report from ABC News Online, the BOP stated that it tested 0.0178% of the total prison population and out of those tested 71.23% came back positive for COVID-19.

Based on that percentage it's estimated that the BOP would have over 179,000 of 251,000 inmates test positive  and would have over 5,500 deaths.

Several inmates throughout the system have reported that the cleaning solutions when given to inmates is diluted down to 9 parts water to one-part cleaner. Most get 4 ounces every two weeks in a cup to clean their cells.

The inmates are to be wearing face masks yet the prison system does not have a sufficient amount to give leaving many prisoners unprotected. Some prisons have handed out one mask and others will provide one disposable one per week.

The BOP has changed its criteria several times since the issuance of the memorandum by Attorney General Barr. Within the last three weeks the BOP has released prisoners of varying degree and not setting any standard what-so-ever to give fair and equal consideration. The Wardens who have been given the authority have no structure to their decision making, and most have passed the issue to the various Unit Teams in the prisons consisting of a Case Manager and Unit Manager. The Unit Team announced that each inmate is being reviewed therefore they would not accept any written requests. It has been more than 40 days since this announcement with no response to the defendant or any other inmate.

The BOP originally stated that an inmate must have served at least 70% of their time and now two weeks later it has dropped to 60% and then 55% and 50%. Presently at 50% the Unit Teams and Wardens are not sure whether its 50% before or after the good time credits are taken into consideration. Within each prison the standard is different. For the ones who do consider the good time credits, most have not yet been awarded the additional 7 days per year that Congress passed under the First Step Act.

## EXHAUSTION REQUIREMENTS NON-JURISDICTIONAL

In United States vs. Kelly, the Court found that the defendant who lacks any CDC issues with respect to illness met the criteria and standard for immediate release.

Kelly sent his Unit manager a request to be placed on home confinement or in a halfway house. That request was denied and Kelly appealed the denial. That appeal was still pending as of the date of this ruling.

The First Step Act's exhaustion requirements were non-jurisdictional and that his failure to exhaust his administrative remedies should be excused in light of the COVID-19 pandemic.

…...." The court noted that "[e]xhaustion requirements can either be (1) jurisdictional, meaning the rule 'governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction,' or (2) a '[c]laims-processing rule[], which are rules 'requiring that a party take certain procedural steps at certain specified times.'"

When looking at the text of 18 USC 3582, the court indicated that the language "does not 'clearly state[ ]" that the exhaustion requirement was jurisdictional. The court indicated that the provision does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts. Because of this, the language of 3582(c)(1)(A) did not provide a clear indication that Congress intended the provision to be jurisdictional and this court determined that 3582(c)(1)(A)'s exhaustion requirement was a non-jurisdictional claims-processing rule.

The court also indicated that 3582(c)(1)(A)'s exhausting requirement was not mandatory but one of two ways that a person could get into court. In 3582(c)(1)(A), a person can either engage their administrative remedies or they can "wait 30 days after the warden receives the defendant's request to bring a motion for a sentence reduction."

## EQUITABLE EXCEPTIONS

The court also noted that there were equitable exceptions available as well.  Because 3582(c)(1)(A) has "two avenues of relief," that meant that it had an administrative exhaustion requirement and a timeliness statute and that "equitable exceptions plainly apply to the latter."

The court noted that "In these situations, other courts have applied the 'equitable tolling' standard given Section 3582(c)(1)(A) has the features of a timeliness statute." "For this narrow exception to apply, a plaintiff must show '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" Sandoz v. Cingular Wireless, L.L.C., 700 F. App'x 317, 320 (5th Cir. 2017) (citation omitted).

The court found that Kelly had met both elements.  Kelly had begun the administrative process to request relief and was denied at the first stage.  He appealed the decision and was still waiting for a decision from the warden. The court determined that Kelly had diligently pursued his rights.  The court went on to note that the COVID-19 pandemic was an "extraordinary circumstance" that prevented his timely filing.  Not only has COVID-1 gripped the nation but at the time of the court's order 33 prisoners and 17 staff had tested positive for COVID-19 and 7 prisoners had passed away from the virus.

## LACK OF CDC GUIDELINES

" The court determined that Kelly's argument, the COVID-19 pandemic and the BOP's response, was novel because Kelly is young (22 years old at the time of sentencing in 2014, so

no more than 30 years old at the time of this order) and has no underlying health issues that could leave him at increased risk of a bad outcome per the CDC's guidelines.

Most of the people who have been granted 3582 relief on these cases have had underlying health issues that could leave them at increased risk of a bad outcome per the CDC's guidelines.  But here the court noted that.....

....."it has become increasingly apparent that the BOP has failed to control the outbreak at Oakdale I. Despite the BOP's efforts, COVID-19 has continued to spread at the facility and more prisoners have died.  In fact, almost a quarter of COVID-19-related prisoner deaths reported by the BOP have occurred at Oakdale I.  Given the steadily growing death toll and the apparent continued spread of the disease at Oakdale I, COVID-19 creates an "extraordinary and compelling reason" potentially warranting a reduced sentence"

The court went on to evaluate whether Kelly had demonstrated that he "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.  The court also noted that "Section 3142(g) requires the court to consider factors such as the nature and circumstances of the charged offense, the history and characteristic of the defendant, and the nature of seriousness of the danger to a person or the community at large posed by the defendant's release."

The court noted that while Kelly had pled guilty to one serious, violent crime the court went on to note that he has kept a clean conduct record absent one offense at the beginning of his incarcerated.

The court also noted his good conduct time, jail credit, programming, and completion of educational courses.  After looking at all of this the court found that Kelly did not pose a risk to others or the community if released.


**I. Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify the Defendants Sentence and Order a Release to Home Confinement.**

The First Step Act ("FSA") expressly permits the defendant to move this Court to seek compassionate release, by which this Court may reduce her term of imprisonment, and order that she serve the  balance of the term on home confinement as a special condition of an amended judgment. See 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf: or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. The defendant files this motion now in light of the urgent nature of this matter.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" United States v. Ebbers, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" Id. (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., Ebbers, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. United States v. Beck, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); see also Ebbers, 2020 WL 91399, at *4.

Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." United States v. Young, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

**A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.**

The Court need not and should not wait for the defendant to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to the defendant. See generally Washington v. Barr, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear compassionate release applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. E.g., United States v. James Arberry, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer).

Specifically, courts across the country, and within this Circuit, have so held on the basis of the COVID-19 pandemic. See United States v. Perez, 17-CR-513 (AT) (S.D.N.Y.), ECF No. 98 (Apr. 1, 2020) (finding three exceptions to exhaustion applicable:

(1) futility;

(2) where the administrative process is incapable of providing the requested relief;

(3) where the defendant is subjected to undue prejudice), see also United States v. Zukerman, 16-CR-194 (AT) (S.D.N.Y.) , ECF No. 116 (Apr. 3, 2020) (same); United States v. Colvin, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (waiving exhaustion); United States v. Powell, 94 Cr. 316 (D.D.C.), ECF. No. 98 (Mar. 28, 2020) (same); United States v. Huneeus, 19-CR-10117 (D. Mass), ECF No. 642 (Mar. 17, 2020) (same).

These decisions waiving exhaustion accord with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. See, e.g., Hendricks v. Zenon, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing Granberry v. Greer, 481 U.S. 129 (1987)); Washington v. Barr, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if

delay would cause irreparable injury); Maxwell v. New York Univ., 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." Bowen v. City of New York, 476 U.S. 467, 484 (1986) (quoting Mathews v. Eldridge, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in Weinberger v. Salfi, 422 U.S. 749 (1975): "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in Bowen that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); see also Rafeedie v. I.N.S., 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in

§ 3582(c)(1)(A) places this case squarely within Bowen's holding. Under § 3582(c)(1)(A),

waiving exhaustion will "merely [ ] enable [the defendant] to receive the procedure [he] should

have been afforded in the first place"—it will simply advance by what could be a crucial twenty-

seven days this Court's consideration of the defendant's motion for compassionate release.

Bowen, 476 U.S. at 484.

To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be

brought either by the "Director of the Bureau of Prisons, or upon motion of the defendant after

the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis

added).

In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory

exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes

in the absence of exhaustion. Cf. Booth v. Churner, 532 U.S. 731, 736 (2001) (failure to exhaust

under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained

in federal court because that provision explicitly provides that "[n]o action shall be brought with

respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept even more widely throughout the BOP than it already has).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendants behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendants facility, whichever is earlier " (emphasis added)).

With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic processes.

Congress' concerns about delay are even more pronounced in the current public health crisis. The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." Salfi, 422 U.S. at 765.

The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. See Federal Bureau of

Prisons COVID-19 Action Plan, available at

https://www.bop.gov/resources/news/20200313_covid-19.jsp.

And specifically, as to the defendant, the BOP has not so much as acknowledged receipt of his request for home confinement, an arguably lower bar to relief than compassionate release. Thus, it would be futile to force the defendant to exhaust his administrative remedies—at the cost of his health and, potentially, his life.

**Exhaustion Requirements**

The defendant sought relief from the Warden of the prison and submitted a cop-out (communication) with staff well over 30 days prior to this filing. The Warden handed over the authority of who is released to his Unit Team members.

The BOP Unit Team, due to the inconsistency of the Regional Office of the BOP as well as the Memorandum of A.G. Barr being so vague they are unsure as to who they can release and who they cannot. Each prison is trying to determine which prisoners can even be considered on very different criteria's that change weekly.

When figuring in the defendants Good Time Credits for time they have already served the prisons are determining one set of numbers but the Residential Release Centers (RRC/Halfway House) is claiming a different date. They claim the good time credit does not count until the end of the sentence. This is not true, and the BOP itself, not the halfway house, is the one who determines who qualifies and who does not.

Additionally, good time credits are earned annually, and once earned they cannot be taken back unless through a disciplinary process of the BOP.

The Court can order direct home confinement and the defendant thereby requests the Court to grant her such relief.

## B. "Extraordinary and compelling reasons" warrant a reduction in the Defendants sentence."

The COVID-19 pandemic continues to roil the United States, and BOP in particular. As of May 5, 2020, the United States has over a one million confirmed positive cases and has had 70,000 deaths.

Complications should he contract COVID-19 (if he has not already) falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.

Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the demonstrated failure of BOP to stop the spread, the inability of the defendant to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission.

**DISCUSSION**

Under 18 U.S.C. § 3624(c)(2), a prisoner may be placed "in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2). Accordingly, under normal circumstances, the defendant would be eligible for release to home confinement on August 30, 2029

However, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") expanded the maximum amount of time that a prisoner may spend in home confinement: "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement . . . ." CARES Act § 12003(b), Pub. L. No. 116-136, 134 Stat. 281 (2020). Attorney General William Barr made the requisite "finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons" on April 3, 2020, thereby triggering the BOP's authority to expand the amount of time that a prisoner may spend in home confinement.

Separately from the statutory provisions regarding home confinement, the First Step Act allows prisoners to move for compassionate release from prison when "extraordinary and compelling reasons" warrant such release. 18 U.S.C. § 3582(c)(1)(A)(i). This statutory provision is the one under which the defendant moves before the Court. There are four prerequisites to a court's granting compassionate release under the First Step Act.

First, the defendant must have exhausted his administrative rights with the BOP.§3582(c)(1)(A).

Second, the court must find that "extraordinary and compelling reasons warrant" release. § 3582(c)(1)(A)(i). Third, the court must consider the factors set forth in § 3553(a). § 3582(c)(1)(A). Fourth, the court must find that release is consistent with the Sentencing Commission's policy statements. § 3582(c)(1)(A)(i).

A prisoner exhausts her administrative rights when the BOP fails to bring a motion for compassionate release on her behalf and she exercises all administrative rights to appeal, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" § 3582(c)(1)(A). In this case, the defendant has not exhausted her administrative rights with the BOP, as she transmitted her requests for release to the Unit Team and Warden.

The Court can waive the exhaustion requirement in this case. "Even where [administrative] exhaustion is seemingly mandated by statute or decisional law; the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019). A court may waive an administrative exhaustion requirement "where [exhaustion] would be futile, . . . where the administrative process would be incapable of granting adequate relief . . . [or] where pursuing agency review would subject [the person seeking relief] to undue prejudice." Id. at 118–19 (citing McCarthy v. Madigan, 503 U.S. 140, 146–48 (1992), superseded by statute on other grounds as recognized in Booth v. Churner, 532 U.S. 731, 740 (2001). "[U]ndue delay, if it in fact results in catastrophic health consequences,", or when "relief is available but due to a lack of

action by the BOP causes harm and consequences", can justify waiving an administrative exhaustion requirement for any of those reasons.

The Court looks for extraordinary and compelling reasons to warrant the defendant's release from prison. 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission has issued a Policy Statement that defines "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) ("USSG"); see United States v. Ebbers, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399 at *4 (S.D.N.Y. Jan. 8, 2020); United States v. Bellamy, No. 15-165(8) (JRT/LIB), 2019 WL 3340699, at *2 (D. Minn. July 25, 2019).

The defendant has a history of suffering from continuous bouts of chronic asthma as well as hypertension, which puts him squarely within any of the Policy Statement's definitions of "extraordinary and compelling reasons," see USSG § 1B1.13 cmt. n.1(A)–(D), as well as the CDC's list of conditions more likely to catch the virus. The defendant asserts that the COVID-19 pandemic, combined with continuous battles of chronic asthma, as well as hypertension that the prison will not treat, puts him in a particular vulnerability to complications from COVID-19. As a remedy the prison has provided the defendant with baby aspirin and when requested an inhaler. Because of the defendants illness this constitutes an "extraordinary and compelling reason" for immediate release.

Additionally, the defendant's wife is a diabetic but also the sole earner within the family home. The defendants wife has a child with Cerebral Palsy who is in constant need of assistance by an adult. The defendant if released would be the co-caregiver for his step-child. The defendant would also be able to contribute to finances of the household. Until the defendant is released the defendants family will continue to suffer.

The stress level for both the defendant and his wife were at the highest point of their lives with the defendant leaving behind a handicapped child and wife and now a wife who is stressing with the fear her husband is living in danger.

In the District of Massachusetts the Court determined that Mr. Bucci's circumstances were similar to those that the Sentencing Commission specifically articulated as examples of "extraordinary and compelling reasons" in the Sentencing Commission's policy guidance in places like USSG 1B1.13 n.1 (C) (ii). The Sentencing Commission had made it clear that courts ought to consider an inmate being the "only available caregiver" for an ailing close member of his family to be an "extraordinary and compelling reason" for compassionate release.

Turning to Mr. Bucci's case, the court determined that Mr. Bucci's role as the only potential caregiver for his ailing mother to be an "extraordinary and compelling reason" for compassionate release. The court went on to note that the documents submitted to the court showed that he had demonstrated rehabilitation through his substantial time in prison. The defendant within faces the same issues of needing to be of assistance to her parents and looks to this Court for the same relief being provided to similarly situated defendants.,

Under Section § 3553(a) factors, the Court must consider in deciding whether to grant compassionate release. See § 3582(c)(1)(A). Under § 3553(a), the Court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." §

3553(a). In particular, the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant. (2) the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) [the kinds of sentence and sentencing range provided for in the USSG] (5) any pertinent [Sentencing Commission policy statement] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

District courts have taken various positions regarding the level of deference that they should afford to the Sentencing Commission's Policy Statement in assessing whether extraordinary and compelling reasons for release are present. See Ebbers, 2020 WL 91399, at *4 (deeming the Policy Statement "at least partly anachronistic" because it pre-dates the First Step Act but "nonetheless[] helpful in defining a vague standard"); United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (concluding that district court may make "independent assessment" of whether extraordinary and compelling reasons exist); see also United States v. Young, No. 2:00-cr-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release.").

## 8ª AMENDMENT VIOLATION

A class action lawsuit against the Warden of FCI Danbury brought to light the violation of a inmates Eighth Amendment Rights.

In an initial ruling by Judge Shea stated that there may be an 8ª Amendment violation (cruel and unusual punishment). Judge Shea who issued an order that requires the Warden to adopt a process of accelerating the evaluation of inmates…"this failure bolsters a conclusion that Petitioners have show a likelihood of success on the merits of their claim that the BOP is displaying deliberate indifference in violation of the 8ª Amendment. Judge Shea's Order described the tight quarters and shared living areas in prison that make "social distancing " almost impossible.

**The Defendant Has Demonstrated A Pursuit of Knowledge and Rehabilitation Through Continued Education Within the BOP**

The defendant was not ordered by the Court to enhance her knowledge and skills by participating in some of the BOP school programs they offer, but instead of sitting around all day playing cards, and watching soap operas she excelled.

The defendant not only voluntarily signed up for various classes offered by the prison, but she gave up other activities in order to have enough hours in the day to increase her skills and knowledge in preparation of finding employment when released to society.

In a setting consisting of inmates of various backgrounds and mentalities an inmate has to maintain an image in order to avoid issues and problems that arise around them whether provoked or not. For an inmate to go out of their way to better themselves in this environment speaks volumes about their goals and desires to show the court and society that the justice system works for those who have awaken to a fresh start in life.

## II.    The Defendant Has The Ability To Obtain Employment Upon Release

The defendant has shown through various classes he has taken not only learned valuable skills to help him in the abilities to gain employment but also to have the skills to cross over from one type of employment to another. This will allow him to be multi versatile which not only provides him more job opportunities but also allows potential employers the ability to use him in various positions.

Additionally, the defendant has skills in the hanging of drywall and other construction trades and has a waiting job building log cabins with his brother.

## III.    The Defendant Has A Means of Transportation

The defendant within her exit plan back into society has obtained transportation which will allow her to travel to and from work, and to visit her probation officer with no issues.

## IV.   The Defendant Has A Stable Home To Live In, If Released To Home Confinement

Detention, where the defendant will be safer and the public will be safe. If released to home confinement, the defendant will not be completely at liberty; he will be confined to 908 4th St., S.E., Washington, D.C. 20003.  The home of Tamekia Balthrop's residence is where the defendant will remain confined until the end of his sentence, regardless of the hopeful passage of the threat of the virus.

Undoubtedly, the defendant will be better able to practice social distancing and handwashing at Ms. Balthrop's home than inside of a federal prison. And should he become afflicted, he will be far more able to access quality medical care in the community than within this prison. The defendant presents no risk of flight or danger that outweigh the risks to his health of remaining in prison while this pandemic ravages through its walls.

The defendant is eligible for home detention via the CARES Act and Attorney General Barr's directives, and should be home already, if the BOP were willing to comply with its obligations. This Court should step in to protect the defendant's health and give him the equal protection awarded to fellow inmates.

## V.   Bond and Safety Net

One of the biggest concerns of any Court is whether a defendant is ready to be placed back into society and whether he or she will become a productive member of society and not fall back into the criminal thinking pattern.

Most defendants who end up back into prison do so because they fall back into associating with the same group. The pressure and influences of others cause many defendants to lose their strength they need to remain clean and lawful.

The strongest chance of remaining free of criminal thinking is having a safety net consisting of people that love and care for the defendant. Having multiple people around you that are strong mentally and are available at all hours of day and night to help the defendant get through any weak moments. The defendant has this, he has a family and friends and a community willing to back him up through all of this.

Taking liability of someone else's actions and being responsible for them shows something that is very seldom seen to this degree and that is two people willing to come forth before the Court and under oath tender themselves to the Court as Bond.

Tamekia Balthrop, spouse of the defendant, is offering to police the defendant as his guardian while on release from the court until his term of incarceration ends. The spouse of the defendant will state to the Court that she will report to authorities any illegal activities should the defendant engages in ever again. If the defendant decides to flee the jurisdiction he will know he is placing his spouse at risk of being held in contempt of court for his actions.

For anyone especially the spouse of the defendant who is willing to turn their own spouse into the authorities should he break any law is a tough stance to take but they are willing to go further and risk herself and her rights by standing up for the defendant.

**CONCLUSION**

For the foregoing reasons, the defendant respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement or, in the alternative, halfway house allowing for the transition.

Respectfully submitted,

Aaron Williams, Pro Se
Reg # 26882-016
Defendant
FCI Fort Dix
PO BOX 2000
JB MDL, New Jersey  08640-0902

# CERTIFICATE OF SERVICE

I Aaron Williams, Pro se, the Defendant in the matter being submitted hereby declares that I have mailed a copy of the following petition:

## DEFENDANTS MOTION UNDER 18 U.S.C. § 3582(c)(1)(A)(i)
## TO MODIFY HIS SENTENCE

To the following parties:
Clerk of the Court
US District Court
333 Constitution Avenue NW
Room 1225
Washington DC 20001

The petition was mailed by way of the United States Postal Service, First Class, Postage Paid and was delivered to the Inmate Legal Mailbox on the 2nd day of June 2020 by hand delivery.

I state this to be true under the terms of perjury. Signed this 2nd day of June 2020.

Respectfully submitted,

Aaron Williams, Pro se
Defendant

**UNITED STATES POSTAL SERVICE**® **Click-N-Ship**®



usps.com
**$7.75**
**US POSTAGE**
Flat Rate Env

9405 5036 9930 0405 9728 33 0077 5000 0642 0001



06/04/2020   0 lb 6 oz      Mailed from 60477      062S0000001301

## PRIORITY MAIL 2-DAY™

AARON WILLIAMS #26882-016
FCI FORT DIX
PO BOX 2000
JB MDL NJ 08640-0902

Expected Delivery Date: 06/08/20

**0004**

**Carrier -- Leave if No Response**     **C003**

SHIP
TO: US DISTRICT COURT
CLERK OF THE COURT
333 CONSTITUTION AVE NW RM 1225
**WASHINGTON DC 20001-2802**

### USPS TRACKING #



**9405 5036 9930 0405 9728 33**

Electronic Rate Approved #038555749